JEFFREY L. CLEMENS
5210 W. Waterberry Drive
Huron, OH  44839
Tel: 419-433-4438

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

JEFFREY L. CLEMENS,          )    Case No. 18-mc-91287-IT
                             )
      Plaintiff,             )    **SECOND AMENDED COMPLAINT**
                             )
      v.                     )
                             )
MICHAEL J. O'HARA,           )
                             )
      Defendant.             )    Hon. Indira Talwani
_____)

### Parties

1)    Plaintiff Jeffrey L. Clemens is a freelance writer

      and activist.  He is a citizen and resident of the

      State of Ohio.  His address is: 5210 W. Waterberry

      Drive, Huron, Ohio 44839;


2)    Defendant Michael J. O'Hara is a former sergeant, now

      lieutenant [retired], with the Scituate [MA] Police

      Department.  His address is: 447 Clapp Road, Scituate,

      Massachusetts 02066;

## Jurisdiction

1)   The U.S. District Court, District of Massachusetts, Eastern Division, has jurisdiction pursuant to 28 U.S.C. §1331 and §1332.

2)   This is an action arising under the laws of the United States, Commonwealth of Massachusetts, and common law.

3)   The acts and omissions alleged herein occurred in the towns of Scituate and Hingham, Massachusetts and the cities of Boston, Massachusetts and New York, NY.

4)   As Plaintiff Clemens is a citizen of the State of Ohio and Defendant O'Hara is a citizen of the Commonwealth of Massachusetts, parties are therefore diverse.

## Summary

This action brings forth a state tort claim of malicious prosecution. On May 12, 2005, the plaintiff made an inquiry to Scituate resident Shelly Laveroni-Dell. The plaintiff was asked to leave and he left. However, minutes later, he was intercepted by Scituate Police Officer Michael O'Hara, [who responded to a 9-1-1 call made by Shelly], subjected to an arrest and prosecuted at the Hingham District Court, Hingham, Massachusetts. A September 18, 2008 jury trial conviction was overturned on July 8, 2010.

Despite reintroduction of the disorderly conduct charge on October 25, 2010, the Commonwealth did not conduct a new trial and the prosecution saw no further conviction[s]. On February 20, 2012, Plaintiff Clemens ["the plaintiff"] filed a motion to dismiss for lack of retrial within one year. On June 16, 2015 the charge was dismissed. This lawsuit follows.

## Allegations

1. That on May 12, 2005, the plaintiff traveled from Western Massachusetts, where he then lived, to the Town of Scituate for purpose of making inquiries in regards to a civil case filed in the U.S. District Court [Los Angeles];

2. That at about 4:20 p.m., on May 12, 2005, the plaintiff visited the Scituate Town Hall located at 600 Chief Justice Highway and obtained copies of public land records for the property located at 52 Old Oaken Bucket Road, in Scituate [There are other owners designated A-D in separate houses but those are not noted herein];

3. That such records confirmed that Jerry Laveroni and his wife, Sherrie, owned said property, purchasing it in May 2000;

3

4.  That Jerry Laveroni is a former stuntman for Wild, Wild
    West, a 1960's television series starring Robert Conrad;

5.  That Conrad is peripherally involved in litigation
    brought by the plaintiff on September 21, 2000 in Los
    Angeles entitled <u>Clemens</u> v. <u>Creative Artists</u>;

6.  That at about 5:00 p.m. on May 12, 2005 (a Thursday)
    the plaintiff, upon the prompting of a nearby neighbor,
    Sandra Frankmann, approached the Laveroni residence
    located at 52 Old Oaken Bucket Road, rang the door bell
    and a woman (with a young child beside her) answered;

7.  The plaintiff said, in a pleasant tone, "Good afternoon.
    My name is Jeffrey Clemens.  I'm inquiring of a matter
    in Los Angeles involving Robert Conrad."

8.  That the woman, later identified as Shelly Laveroni-Dell,
    paused and, having asked no questions nor saying anything
    more, said to the plaintiff, "I will have you know you
    are on private property and being asked to leave."  And
    she immediately picked up an aerial phone on a nearby
    stand, dialed some numbers and began speaking (into
    phone), "There's a strange man at my door.  I don't know
    who he is.  I don't know what he wants…"

9.  That the plaintiff asked the woman nicely, "Are you
    calling 9-1-1? Are you calling the police?" She did not
    answer and continued to speak into the phone. Plaintiff
    then said, "I'm going to the station", and he left after
    having been on her porch for less than *one minute*;

10. That several minutes later (after plaintiff stepped away,
    returned to his vehicle, and drove off), the plaintiff
    was pulled over by Defendant Michael O'Hara and joined
    thereafter by Officer Timothy Goyette who, as learned
    later, had, at the time, just come from an interview with
    Shelly following what came to be known as her phone call
    to 9-1-1 [such interview was never reported];

11. That O'Hara, after some questioning, left to go see
    Shelly [presumably] while Goyette remained with plaintiff
    who had earlier been instructed, by O'Hara, to meanwhile
    stand in front of his vehicle, which he did;

12. That after 20-25 minutes, O'Hara returned, approached and
    said to plaintiff, "You are free to go." As plaintiff
    was getting back in his vehicle, O'Hara, as he returned
    to his vehicle, paused, turned around and said, "By the
    way, you'll be getting a summons in the mail. You're
    being charged with impersonating a private investigator";

5

13. That as a result of O'Hara's last comment, the plaintiff paused and asked several questions as for what Shelly or others [presumably] said to him [O'Hara].  O'Hara said repeatedly, "I don't have to tell you anything."  Just as plaintiff said, "Well, you're telling me I'm going to get a summons.  What did these people [Shelly or others] say to you?", O'Hara said softly but firmly, "That's it."

14. That upon hearing, "That's it", Goyette shouted, "Fucker!" and lunged at the plaintiff.  O'Hara put handcuffs on the plaintiff and drove him, without explanation, to the police station, later reporting that the plaintiff "got enraged", shouted,  "I want to settle this fucking now" and "lunged" at O'Hara, all not true;

15. That Clemens, as he only learned at the station while being booked, was charged with Disorderly Conduct and held in custody for close to four hours;

16. That on May 4, 2007, upon a two-year statutory deadline, the plaintiff brought suit in U.S. District Court/Boston against O'Hara and others for false arrest and false imprisonment and against the Town of Scituate [MA] for constitutional violations pursuant to 42 U.S.C. § 1983;

constitutional violations pursuant to 42 U.S.C. § 1983;

17. That in June 2008, after numerous prior requests, some
    dating to May 2005, and some, too, having been addressed
    to O'Hara's attorney, Stephen Pfaff, in civil discovery,
    the Commonwealth turned over police radio logs and 9-1-1
    tapes relating to the events of May 12, 2005;

18. That on said 9-1-1 tapes Shelly can be heard saying, "My
    neighbors called.  They said he [plaintiff] was asking a
    lot of questions about my father…"

19. That on May 12, 2005 just prior to ringing the Laveroni's
    door bell, Clemens spoke with "neighbor" Sandra Frankmann,
    who had been sitting on her front steps sipping a drink,
    but at no time asked about Shelly's father ["Jerry"],
    only asking if she [Sandra] had ever seen next door "a
    dark blue minivan" around the time of "August 2000";

20. That Sandra said she had just inherited her house "last
    November" [2004] and thus did not know of such van; she
    then volunteered to say that the man who lives next door
    "is with the New York Mets" and wanted to buy her house;

21. That the plaintiff did not correct her [Jerry Laveroni
    was with the New York *Yankees*, not the Mets] as the focus
    of his inquiry was the van, not the man;

7

22. That Sandra further indicated that she was having dinner
    with her neighbor, Susan Smith, that evening and offered
    to call her so plaintiff could ask *her* about the van; she
    did, and then handed the phone over to the plaintiff;

23. That the plaintiff, on the phone, introduced himself then
    assured Ms. Smith that matters were of a civil nature,
    not criminal, before posing the question, "Have you ever
    seen a dark blue minivan next door [implying, at the
    Laveroni's]?"  She said, with some trepidation, "No."

24. That lastly, upon she noticing someone getting his mail,
    Sandra suggested to the plaintiff that he ask *him* about
    the van as he was a tenant in a cottage on the Laveroni
    property; the plaintiff walked the 100 or so feet over
    to the man and introduced himself; the man identified
    himself as "Michael Schneiderat" and, when asked about
    the van and "August 2000", he said he moved there in 2001
    but he had seen, on occasion, a van pick up kids to go
    play soccer; plaintiff thanked him and returned to Sandra;

25. That upon returning to Sandra, the plaintiff asked for
    her phone number and that of Susan Smith; Sandra provided
    both before then saying that "[t]he daughter is there now.
    Why don't you go over and ask *her*?"

8

26. That the plaintiff thanked Sandra, excused himself and
    then walked over to the Laveroni residence, stopping to
    take notice of a late model champagne-colored minivan
    with a New York license plate and "Manhattan" plate cover;

27. That at no time, while questioning the neighbors about a
    dark blue minivan, did plaintiff ever ask any questions
    about "the father" [Jerry Laveroni];

28. That at no time either did the plaintiff ever identify
    himself as "a private investigator"; he at all times said
    his name, "Jeffrey Clemens", and that he was "inquiring"
    about a "matter in Los Angeles" or a "dark blue minivan";

29. That on the morning of May 13, 2005 O'Hara prepared a
    report in which there was no reference to any neighbor or
    "dark blue minivan" [nor "Robert Conrad"], only that
    Shelly had [supposedly] told O'Hara that the plaintiff
    had said to her he was a "private investigator"; nor,
    likewise, was there, in the report, any mention of any
    neighbor's phone call[s] to Shelly;

30. That Sandra Frankmann had an aerial phone in her hand
    during the entire Clemens inquiry;

31. That Sandra Frankmann, it is believed, after urging
    the plaintiff to inquire of the Laveroni's, and as the
    plaintiff was walking to the Laveroni's, called the
    Laveroni's and, in any case, in the moments or minutes
    before plaintiff rang the Laveroni's doorbell, someone
    called and spoke with Shelly and said things, now unknown
    but nonetheless discoverable, that "alarmed" her [Shelly]
    thereby prompting her to call 9-1-1 upon the plaintiff's
    arrival at her door;

32. That, it is believed, the Scituate Police, particularly
    Officers O'Hara and Goyette, came to know of the call to
    Shelly, and of the identity of the caller, whether it was
    Sandra Frankmann or not, but did not at any time record
    or report it;

33. That Officer Goyette never at any time filed a report
    even though: (1) he was the first to speak with Shelly,
    and (2) he was the one, not O'Hara, who commenced the
    plaintiff's arrest, yet doing so on O'Hara's cue [See
    Paragraph 14, Page 6];

34. That on the evening of May 12, 2005, before O'Hara filed
    his May 13, 2005 report, Jerry Laveroni called the police
    yet records do not indicate the nature of his contact;

35. That on Monday, May 16, 2005, U.S. Secret Service Special
    Agent Ralph Sozio, of New York, contacted the Scituate
    Police and left a message for O'Hara to call him; O'Hara
    responded on or about May 17, 2005 and Sozio, according
    to O'Hara in a July 2008 deposition, informed him that he
    had an office at Yankee Stadium and that he had "security
    concerns"; we do not know anything further, as the police
    filed only a nominal report; however, it is apparent that
    Sozio was, at the time, a colleague of Jerry Laveroni
    [father to Shelly], the Yankee's [then] Director of Team
    Security;

36. That on the same day as the Sozio-O'Hara conversation,
    the Scituate Police, namely, a Lieutenant Mike Rooney,
    filed two further charges against plaintiff, Criminal
    Harassment and Unlicensed Private Investigator;

37. That the Rooney application specified no "victim" as for
    the harassment charge, only stating that phone calls made
    to Shelly *by her neighbors*, Sandra Frankmann and Susan
    Smith [not plaintiff], informing her of the plaintiff's
    then recent calls to them, had "alarmed" Shelly;

38. That the plaintiff, on Saturday, May 14, 2005, called
    Sandra Frankmann and Susan Smith, leaving pleasant and
    nearly identical messages on their answering machines;

39. That the plaintiff's messages were short, friendly and
    courteous, simply saying, "Hi, this is Jeffrey Clemens.
    I am calling about the other day.  If you have any
    questions or concerns please give me a call at [plaintiff
    gave his then current phone number].  Thank you."

40. That furthermore, on May 17, 2005, O'Hara, at the behest
    of Sozio, faxed his May 13, 2005 report to him [Sozio],
    in New York, laden as it was with false information;
    police records do not indicate why such fax was sent nor
    for what reason, only that it was sent;

41. That on October 31, 2008, ADA Richard Linehan, in open
    court, without explanation nor plea agreement, sought and
    received the court's dismissal of the Harassment charge;

42. That the Unlicensed Private Investigator charge, long-
    argued as being without sufficient facts, yet having
    induced the disorderly conduct charge, languished for
    years while an eventual November 2008 trial was usurped
    due to Shelly, as the Commonwealth [Linehan] alleged,
    being "out of the country", thus compelling the plaintiff

42. (continued) to take a Continuance Without A Finding plea
    which he subsequently sought to set aside by a Rule 30
    motion for a new trial [July 2009] but which, by acts and
    omissions of persons unknown, went unaddressed for years;

43. That said Rule 30 motion, having languished for years,
    was ultimately denied in a January 2012 surprise ruling
    by a certain Judge Lance Garth [at Fall River District
    Court] of which plaintiff was not made aware until June
    16, 2015 upon personally inspecting the record at the
    Hingham District Court, his first opportunity in years;

44. That on or about July 21, 2008 the plaintiff visited the
    NYC-Brooklyn offices of the U.S. Secret Service seeking
    to speak with Ralph Sozio who, as plaintiff was told, by
    phone, in the lobby [he was not permitted access to its
    suite of offices], was not available;

45. That the plaintiff left a message with Sozio's supervisor,
    Rodney Stewart, who later called the plaintiff, spoke and
    it was left that Sozio would call the plaintiff, which he
    never did;

46. That on or about July 28, 2008, within a week of the
    plaintiff's Brooklyn inquiries, Linehan and fellow ADA
    David C. Belger filed a request to continue a scheduled

13

Case 1:20-cv-12083T Document 21 Filed 06/11/18 Page 14 of 48

46. (continued) August 6, 2008 hearing to September 18, 2008, the result of which proceedings on the disorderly conduct charge and plaintiff's two other charges were scheduled to go before a certain Judge Ronald F. Monahan;

47. That between the plaintiff's inquiry and July 28, 2008, on behalf of the Laveronis ["secretly" represented by Pfaff, as plaintiff learned on September 17, 2008 at a deposition of Goyette in Pfaff's office; *See* Paragraph 53], Sozio, it is reasonable to believe, contacted either O'Hara or Rooney, or both, and, as a result, ADAs Linehan and Belger continued the August 6, 2008 hearing to effect what was to be a single-witness, police-centered criminal trial proceeding with Moynahan on September 18, 2008;

48. That Judge Moynahan was previously an Assistant District Attorney for the County of Plymouth, working at one time with ADAs Linehan, Belger and Tobin [*See* Paragraph 93];

49. That ADA Belger has relatives living in Thousand Oaks, CA;

50. That Robert Conrad, to which plaintiff referred in his May 12, 2005 inquiry to Shelly Laveroni, resided in Thousand Oaks, CA, at the time [2008] [*See* Paragraph 7, Page 4];

14

51. That at no time or place in any official report did O'Hara ever cite plaintiff's reference to Robert Conrad during his inquiry to Shelly on May 12, 2005;

52. That O'Hara can indeed be heard, in radio logs dated May 12, 2005, referring to Robert Conrad;

53. That on September 17, 2008, at a scheduled deposition of Timothy Goyette, which Defendant O'Hara attended as well, by invitation of Pfaff, oddly enough [O'Hara was deposed months earlier in April 2008], Defendant Pfaff informed plaintiff that he had been in contact with the Laveronis concerning his representation of them in the plaintiff's lawsuit [filed in May 2007 and served on parties in July 2007, including Shelly Laveroni, who never answered] and that, if plaintiff would "waive" the default, by the Laveronis, he [Pfaff] would, within 30 days, "turn over" Shelly Laveroni for deposition; the plaintiff did not agree to such waiver;

54. That furthermore, at said deposition, Pfaff commented that Judge Stearns [i.e. Richard Stearns], who was overseeing the plaintiff's lawsuit, was a college roommate of Bill Clinton at Oxford;

55. That, according to author Joe Conason, in his book about Clinton entitled Man of the World, published in September 2016, U.S. Secret Service Special Agent Ralph Sozio was [formerly] on the Clinton Presidential Protection Detail;

56. That numerous complaints and FOIA [Freedom of Information Act] requests by plaintiff to the Secret Service did not yield the 2005 O'Hara Report sent to Sozio on May 17, 2005 nor reveal that Sozio was on the Clinton protection detail;

57. That, by all appearances, upon his May 17, 2005 inquiry to O'Hara, Sozio was not working in his official capacity but on the behest of the Laveronis or others unknown;

58. That on September 18, 2008, the Commonwealth commenced a trial against the plaintiff for disorderly conduct with the only witness available being Defendant O'Hara. Goyette, despite his participation in a deposition the day before, was not present nor made available;

59. That O'Hara's testimony at said trial was almost entirely a fabrication;

60. That Pfaff, by inviting O'Hara to sit in on the Goyette deposition the day before, effectively suborned perjury;

16

61. That O'Hara's testimony was the only evidence presented by the Commonwealth at the plaintiff's trial;

62. That the O'Hara testimony resulted in a verdict of guilty;

63. That Judge Moynahan immediately sentenced the plaintiff to a term of six months incarceration [the statutory maximum];

64. That as a result of the trial conviction, Pfaff motioned for summary judgment in regards to the plaintiff's lawsuit [See Paragraph 16] and, on May 22, 2009, the court granted judgment in favor of O'Hara, the Laveronis and others;

65. That the plaintiff, despite numerous efforts at relief, served his entire six-month sentence, less "good time";

66. That for the incarceration of plaintiff on September 18, 2008 there was no possibility of deposing Shelly Laveroni;

67. That Moynahan's wife, Marguerite, at the time [2008], taught third grade elementary students in Scituate, MA;

68. That Shelly Laveroni's daughter [not named herein but referenced in Paragraph 6, Page 4], at the time of the plaintiff's trial before Moynahan, was a third grade student, it is believed, in Marguerite's class;

69. That said daughter [of Shelly's] was an eye witness to
    events related to the arrest of the plaintiff on May 12,
    2005 and the subsequent charges brought against him
    including, indirectly, the disorderly conduct charge as
    O'Hara's testimony and, in turn, credibility – at trial as
    well as in his charging papers – were based on information
    that O'Hara claimed to have gotten from Shelly [about
    events occurring in her daughter's presence], mainly, that
    the plaintiff said to Shelly he was a private investigator;

70. That Shelly's daughter had the capacity to contradict
    O'Hara's trial testimony as well as his charging papers;

71. That the plaintiff never said to anyone on May 12, 2005,
    nor at any time before or after, that he was a private
    investigator;

72. That if Shelly, on May 12, 2005, informed O'Hara that the
    plaintiff said he was a private investigator then she lied;

73. That if Shelly Laveroni, on May 12, 2005, did *not* inform
    O'Hara that the plaintiff had said to her he was a private
    investigator then O'Hara lied;

74. That, either way, whether Shelly lied to O'Hara or O'Hara lied in his charging papers [May 13, 2005], a lie was told to a jury [September 18, 2008];

75. That furthermore on September 18, 2008 Moynahan failed to address pretrial motions and issues and, in turn, insisted, to the protest of the plaintiff, that a trial [for the disorderly conduct charge only] commence, to the detriment of the plaintiff as only one witness was present, O'Hara, and no others, neither Goyette nor Shelly nor any neighbor;

76. That on or about November 19, 2008, less than one week from a scheduled UPI [Unlicensed Private Investigator] trial, the plaintiff was physically assaulted while he was detained at the Plymouth County Correctional Facility;

77. That a fellow inmate, after lockdown [Lights Out], without cause, suddenly punched the plaintiff in the face and threw him down on the floor, breaking several of his ribs;

78. That on or about November 20, 2008, an institutional parole officer approached plaintiff, in Plymouth, and said that she would otherwise schedule a parole review for the (then) following Monday, November 24, 2008, however, that because of an open Unlicensed Private Investigator ["UPI"] charge she was "not able to do so";

19

79. That a November 25, 2008 scheduled trial date came and
    went without a trial for the plaintiff on the UPI charge;

80. That at a later rescheduled hearing on December 2, 2008
    ADA Linehan indicated that Shelly Laveroni, who was
    arguably the Commonwealth's primary witness and accuser,
    "was out of the country until late January", thus pre-
    cluding a continued timely trial;

81. That on December 2, 2008 the Court, presumably prompted by
    ADA Linehan, offered a "guilty filed" plea; the plaintiff
    flatly declined and a trial was reset for January 25, 2009;

82. That, anxious to dispose of the UPI charge and, in turn,
    have a parole hearing as well as disengage himself from
    his dangerous and injurious fellow inmates, the plaintiff
    took a Continuance Without A Finding [C-W-O-F] plea on
    December 10, 2008 after having requested but being denied
    an earlier (December, not January) rescheduled trial date;

83. That if not for the open UPI charge the plaintiff's parole
    date would have been December 16, 2008, a date which had
    indeed come and gone without a parole hearing or release
    so that, on December 19, 2008, the plaintiff, without
    counsel, filed a motion to withdraw his C-W-O-F, citing,

20

83. (continued) for one, lack of prejudice to his previously
    rescheduled trial, which was still over a month away;

84. That the Court [Hingham District] "ignored" plaintiff's
    plea withdrawal motion, by and through the acts and
    omissions of persons unknown, having the consequence
    of allowing the UPI C-W-O-F plea to stand indefinitely;

85. That but for the acts and omissions of Linehan, and the
    acts and omissions of persons unknown [acting in secret
    at the Hingham District Court], the plaintiff did not have
    a parole hearing until January 2009 and was not released
    from custody until February 6, 2009;

86. That ADA Linehan promoted the notion that Shelly Laveroni
    was "out of the country" [for two months] despite the fact
    that she was an employee of the Norwell [MA] School System
    [who was obviously still in session] and that Linehan, on
    November 5, 2009, informed the Court that he was "ready"
    for the November 25, 2008 UPI trial;

87. That the plaintiff, in the summer of 2009, made attempts
    to reconcile Shelly's absence from the November 25, 2008
    UPI trial by addressing letters directly to her and Pfaff,
    to no avail [neither she nor he answered the letters nor
    provided the evidence sought by the plaintiff, that is,

87. (continued) proof of any kind such as ticket stubs or passport stamps showing Shelly was "out of the country";

88. That as a result of said letters Jerry Laveroni, as can be proven by certain email evidence coming into plaintiff's possession in April 2011, referred Defendant O'Hara's attorney, Stephen Pfaff, to U.S. Secret Service Special Agent Ralph Sozio in New York which then later brought about communications with U.S. Attorney Nadine Pellegrini in and around December 2009;

89. That, yes, Pfaff and Laveroni, in 2009, attempted to have the plaintiff charged with some kind of offense ["threat", it appears] but, of course, were not successful;

90. That said letters contained no threat of physical harm but, rather, contained a notice of intent to file a lawsuit for malicious prosecution with regard to the UPI charge, that is, if certain requested information about Shelly's alleged travel "out of the country" was not forthcoming;

91. That Nadine Pellegrini has long associated with BARL [Boston Animal Rescue League] as had a certain John Halamka [his own personally-managed animal shelter uses BARL resources, such as photographs and referrals];

92. That Shelly Laveroni's husband, Tyrone Dell, is a
colleague of Halamka at Beth Israel Deaconess Medical
Center;

93. That on March 9, 2010, Pfaff forwarded a plaintiff email
to FBI Special Agent Eric Toole who, in turn, forwarded it
to AUSA Nadine Pellegrini who, within minutes, according
to email time stamp indicators, in her response to Toole,
despite the email's complexity, stated: "We now have to
charge this guy", handing the case to AUSA David G. Tobin;

94. That Pellegrini, and Tobin, did, in fact, pursue charges
leading to a May 2011 trial for "interstate threat"
wherein a certain Juror 12, Bryan Gothie, of Sudbury,
Massachusetts, under questionable circumstances, sought
recusal from the jury for an alleged and self-professed
feeling that he was somehow "threatened" by the plaintiff;

95. That the trial led to a verdict of "guilty" and a 60-month
sentence of incarceration for Plaintiff Clemens in Case No.
10-10124-DPW, USDC/Boston;

96. That the May 2011 trial verdict was set aside by Section
2255 habeas corpus relief [petition filed April 1, 2015]
on October 6, 2017 [the plaintiff meanwhile served out his
entire 60-month sentence];

97. That Bryan Gothie is a close neighbor to a certain Ron
    Brumback and his wife, Nancy, and, it appears, from the
    plaintiff questioning Mr. Brumback in June 2016, that the
    Brumbacks and Gothies are familiar with one another
    socially, having, for instance, participated in "block
    parties" together;

98. That Nancy Brumback [nee: Verser] is a sister to Craddock
    Verser, a former [now deceased] Washington State judge and
    former law partner to a certain Peggy Ann Bierbaum;

99. That both Peggy Bierbaum and Craddock Verser are former
    adversaries of plaintiff's brother, Jonathan Clemens, as
    result of a divorce and numerous other legal proceedings
    from about 2003 to 2008, including several lawsuits;

100. That Peggy Bierbaum's father-in-law, a Dr. Benjamin
     Bierbaum, is, too, a colleague [at Beth Israel Deaconess
     Medical Center] of not only Dr. John Halamka but
     Halamka's close friend [they are kayaking buddies],
     Tyrone Dell, husband to Shelly Laveroni;

101. That at the January 18, 2012 sentencing for the May
     2010 trial verdict [*See* Paragraphs 93-95 above] Pfaff
     personally presented a Victim Impact Statement [despite
     opportunity to file a written one] that, oddly, focused

24

101. (continued) at length on plaintiff's *brother*, Jonathan [as opposed to plaintiff], and his website, Access to the Courts;

102. That the Access to the Courts website has long criticized the Town of Scituate and Scituate Police for the manner by which the plaintiff has been prosecuted [and arguably persecuted] by them since 2005;

103. That Jonathan's wife, during divorce proceedings in 2007, hired Washington [State] Attorney Peggy Bierbaum, informing her at one point of Jonathan's website and the predicament of plaintiff with respect to Attorney Pfaff and the Town of Scituate;

104. That, it is believed, Attorney Peggy Bierbaum, who was fired, in 2007, within months of representing Jonathan's wife, contacted Pfaff, who became both O'Hara and the Town of Scituate's counsel in July 2007, and discussed their respective situations involving Plaintiff Clemens and his brother and did so personally or through an intermediary, resulting in mutually beneficial strategies and tactics that were not only unethical but extremely harmful to the plaintiff;

105. That such intermediary, if he exists, and as discovery
     has potential to prove, may have been a representative of
     the U.S. Marshals Service who on two occasions visited
     Jonathan at or near his home in the State of Washington
     over letters he had written and posted on his website
     that were critical of certain judges overseeing Clemens
     litigation that, in greater part, involved Attorney Pfaff
     and his cadre of Scituate clients;

106. That for an April 1, 2010 hearing in U.S. District Court
     Pfaff emailed FBI Special Agent Rachel Boisselle [who
     provided testimony before the grand jury, leading to the
     indictment of Clemens], after she had enthusiastically
     informed Pfaff that an arrest warrant for plaintiff was
     being pursued, and asked her to arrange "extra security"
     at said hearing;

107. That, it is believed, Pfaff asked similarly for "extra
     security" i.e. extra marshals at plaintiff's January 13,
     2012 sentencing [*See* Paragraph 101, Page 24];

108. That at said sentencing, following Pfaff's presentation
     and a subsequent retort by the plaintiff, three Court
     Security Officers approached plaintiff [after he stood up
     to address the Court further], handcuffed him and,

108. (continued) without direction of any kind from the
     presiding judge [Woodlock], dragged the plaintiff away,
     who was otherwise remaining calm, and proceeded to
     assault him multiple times, as is documented in
     subsequent lawsuits [Case Nos. 13-13084 and 17-10044];

109. That, it is reasonable to believe, upon a Pfaff request
     for "extra security", a pre-sentencing conference
     occurred, among marshals staff and others, wherein it was
     decided to "disrupt" the proceedings at first opportunity
     in order to prejudice the plaintiff;

110. That the Court [Woodlock] soon thereafter said that his
     [implying, future rescheduled] sentencing of plaintiff
     will reflect the events of the day [implying, the melee
     with the Court Security Officers];

111. That Pfaff, by and through his law practice – one that
     focuses on police and FBI misconduct cases – and through
     his attorney-client relationship with Jerry Laveroni, a
     former longtime police officer and federal agent, has
     peculiar and special access to the FBI and U.S. Attorneys
     Office, as Discovery could well establish;

112. That the Town of Scituate, aware of this special access,
     hired Pfaff in 2007 and again in 2009 just as he [Pfaff]

112. (continued) was "setting up" the plaintiff for a federal prosecution with Toole and Pellegrini as evidenced by an email train on about December 23, 2009, which came into plaintiff's possession in April 2011 [a plaintiff letter warning Town Administrator Patricia Vinchesi that Pfaff had a serious conflict of interest representing the town, its police and numerous state prosecution witnesses was forwarded to Toole and, in turn, on the same day, to AUSA Pellegrini];

113. That by April 2008 Pfaff became in contact with FBI S.A. Eric Toole whose wife, also an agent, has strong ties to the Cleveland, Ohio area, near the plaintiff's hometown;

114. That Stuart Shoaff, father to Krista Toole, Eric's wife, is, too, an FBI agent [retired] from the Cleveland area [as was, as well, Stuart's uncle, "Clark", Krista's great uncle], making them colleagues of FBI S.A. Tom Greenawalt, the arrestor of the plaintiff on March 17, 2010 [8 days after Pfaff presented a Clemens email to FBI S.A. Eric Toole];

115. That Tom Greenawalt was a government witness at the May 2011 Clemens trial [*See* Paragraphs 94-95, Page 23];

116. That plaintiff's arrest for allegedly threatening Pfaff
came only two weeks before a scheduled March 23, 2010
deposition of Shelly Laveroni, to have been conducted by
the plaintiff;

117. That the testimony of Shelly Laveroni had every ability
to contradict O'Hara's September 18, 2008 trial testimony
(prove he perjured himself) as well as his May 13, 2005
charging papers;

118. That the testimony of Shelly Laveroni, too, had every
ability to establish that Pfaff, in turn, suborned the
perjury of O'Hara who, as of September 18, 2008, and
since July 2007, was Pfaff's client with regard to the
plaintiff's litigation;

119. That the Rule 12 motion that Pfaff filed in early March
2010, before Judge Young [with whom Pfaff had, just weeks
earlier (February 10, 2010), unrecorded ex parte contact],
was not filed properly nor timely [Rule 12 motions are to
be filed within 20 days of service of a complaint; Pfaff
was never served; the Court therefore had no authority or
jurisdiction to hear his motion, especially since other
defendants, represented by Pfaff, had already answered
the complaint, thus foreclosing a Rule 12 motion by them];

120. That the Rule 12 motion by Pfaff, besides subverting a
     scheduled deposition of Shelly Laveroni [*See* Paragraph
     123 below], was meant to "infuriate" plaintiff by its
     very filing [Rule 12 motions preclude discovery] while
     furthermore citing, as basis, the September 18, 2008
     trial verdict [which was on appeal at the time but which
     nonetheless was irrelevant since the subject complaint
     concerned the UPI charge, not disorderly conduct] as well
     as the December 10, 2008 C-W-O-F plea that plaintiff had
     long sought to set aside [*See* Paragraphs 83-84, Pp 20-21];

121. That plaintiff's "reaction" to Pfaff's Rule 12 motion was
     the email for which he was arrested on March 17, 2010;

122. That said email had merely expressed the feeling of the
     plaintiff as having been "systematically BUTTFUCKED" by
     Pfaff and his clients, particularly the Scituate Police,
     as for the disorderly conduct and UPI prosecutions;

123. That the arrest and initial detainment of the plaintiff
     [March 2010] was intended to physically prevent a March
     23, 2010 scheduled deposition of Shelly Laveroni;

124. That, in fact, the arrest and detainment of the plaintiff
     led to the deposition's non-performance and cancellation;

125. That the Town of Scituate hired Pfaff, in December 2009, and did so while well aware of his [Pfaff's] alleged suborning of perjury on behalf of its police officers [such allegation was made in a civil complaint served on Town Administrator Patricia Vinchesi in November 2009];

126. That on or about December 21, 2009, the plaintiff, by phone, letter and email, warned Vinchesi that Pfaff's representation of the town was in clear violation of the Massachusetts Rules of Professional Conduct;

127. That despite the warning[s], which Pfaff attempted to convince AUSA Nadine Pellegrini were actionable "threats", Scituate nonetheless hired Pfaff on or about December 23, 2009 when Pfaff, instead of filing a Rule 12 motion [which he did months later], answered the complaint for the Town of Scituate, O'Hara and Shelly Laveroni which, in turn, precluded any future Rule 12 motion, as only a Rule 56 motion was possible after December 23, 2009;

128. That of the three times plaintiff served process on the Town of Scituate from 2007 to 2013, the town defaulted each time on average of from 30 to 60 days and, at that, especially, with Pfaff as its attorney, thus reflecting an attitude of privilege and a disregard for the rules;

Case 1:20-cv-12083T Document 21 Filed 06/11/18 Page 32 of 48

129. That the Town of Scituate, despite the plaintiff having supposedly "threatened" Pfaff, and despite the serious ethics concerns having to do with suborning perjury and representing co-defendants, continued to hire Pfaff numerous additional times from 2010 to 2016 with respect to the plaintiff's litigation;

130. That the plaintiff and his representatives, such as his brother, Jonathan, served numerous letters on the Town of Scituate's Board of Selectmen since 2005; at no time did the Board of Selectmen [BOS] respond;

131. That such letters, as early as August 2005, put the BOS on notice of misconduct by its police department, mainly, Officers O'Hara and Goyette and, later, Attorney Pfaff;

132. That in December 2010 Vinchesi had communications with the BOS and its staff regarding Pfaff, the plaintiff and his November 2010 complaint to the U.S. Secret Service, which plaintiff served on the BOS as well, concerning Pfaff client Jerry Laveroni's colleague, Ralph Sozio;

133. That a copy of said Secret Service complaint, served on the BOS together with a cover letter urging investigation of Pfaff, in fact, was *forwarded to Pfaff* by the BOS;

134. That one of the allegations put before the Secret Service
was that, upon the plaintiff's release from his September
18, 2008 sentence [for a disorderly conduct trial verdict]
and start of a ten-day parole period, on February 6, 2009,
Massachusetts Parole Officer John Torchio had, on and by
his own initiative, it appears [unless we come to learn
otherwise], on or about February 9, 2009, contacted Ralph
Sozio, had a discussion with him about the plaintiff, and
then immediately sought to "violate" the plaintiff;

135. That Torchio did, in fact, upon a communication with
Hingham District Court Probation Officer Robert A. Tobin,
on or about February 10, 2009, file a violation report
for an allegation of "whereabouts unknown" [even though
the plaintiff had, in timely fashion, clearly given him
a new address] and, in turn, the Hingham District Court,
on or about February 11, 2009, issued a bench warrant;

136. That during a late August 2010 phone conversation with
Probation Officer Tobin, the plaintiff confirmed, by
Tobin reading and referring to his notes, that Torchio
had indeed contacted Sozio in February 2009 and conversed
with him about the plaintiff;

137. That the bench warrant, issued by Judge Patrick Hurley
     who, in May 2005, had accepted a Lt. Rooney application
     for an Unlicensed Private Investigator [UPI] charge
     [*See* Paragraphs 36-43, Pages 11-13], served to confound
     efforts of plaintiff and his counsel to have a Rule 30
     motion heard [to set aside the UPI C-W-O-F], the court,
     in October 2009, having declared "No motions to be heard
     until Defendant appears", likewise exposing plaintiff, by
     its warrant, to further potential wrongful incarceration;

138. That the confounding of the Rule 30 motion provided Pfaff
     a basis, though questionable and tenuous, to bring his
     Rule 12 motion in March 2010, one that undoubtedly served
     to put in play a federal prosecution of the plaintiff;

139. That the UPI charge is without sufficient basis on its
     face but nonetheless itself saw prosecution for years;

140. That the Hingham District Court, by and through Judge
     Lance Garth, without notice to the plaintiff, and despite
     a November 2009 notation by Garth indicating he will not
     hear any motions until the plaintiff appears [although,
     by the rules, defendants are not required to be present],
     denied the Rule 30 motion on or about January 6, 2012;

141. That plaintiff, in May 2013, by a notice served on the
Commonwealth and presented to the Hingham District Court,
sought status as for his February 2012 dismissal motion
as well as his July 2009 Rule 30 motion [UPI]; by acts
and omissions of persons unknown [employed at Hingham
District Court] neither the court nor Commonwealth
responded despite having been given clear, timely and
ample opportunity to inform plaintiff of the 2012 Garth
ruling;

142. That on June 16, 2015, the plaintiff, while attending a
hearing before Judge Heather Bradley, at HDC, discovered
that Judge Garth had, in January 2012, denied his July
2009 Rule 30 motion, however, the court, due likely to
the acts and omissions of persons unknown [employed by
the Hingham District Court], never gave notice to the
plaintiff nor his counsel, thereby subverting his appeal
prospects, such unknown person's likely intent;

143. That actions by Ralph Sozio in both 2005 and 2006, as
documented in prior related litigation, with respect to
communications with parties averse to the plaintiff,
particularly the U.S. Attorney's Office, FBI and U.S.
Probation Office, who were seeking to detain plaintiff
in Ohio [and, in fact, succeeded in doing so with help

35

143. (continued) of the plaintiff's then attorney, Jane
     Randall, as explained in his original complaint filed
     in this case], served to keep plaintiff from appearing
     at Hingham District Court on the charges of disorderly
     conduct and unlicensed private investigator, for benefit
     of the Laveronis, Scituate Police and others;

144. That at one point, in 2006, the U.S. Probation Office
     reported that, despite outstanding warrants against
     the plaintiff, "Massachusetts authorities" did not want
     the plaintiff in Massachusetts because, as they claimed,
     of "concerns" for the "victims", otherwise unnamed;

145. That the only victim throughout the entire Commonwealth
     prosecution of plaintiff from May 2005 to June 2015 is
     the plaintiff himself and not Shelly Laveroni or Sandra
     Frankmann or Susan Smith, who are "witnesses" that have
     not ever made statements under oath thus precluding them
     from status as "victim";

146. That the Commonwealth of Massachusetts, at the certain
     behest of the Scituate Police [and later, its counsel,
     Pfaff], and with the assistance of persons unknown [at
     HDC], prosecuted the plaintiff for over ten (10) years
     yet failed to achieve a (lasting) conviction nor provide

36

146. (continued) the plaintiff with access to his original
     accuser, Shelly Laveroni, nor any other witness, say,
     Smith or Frankmann;

147. That the UPI charge indisputably ties to the disorderly
     conduct charge as brought by O'Hara on May 12, 2005; a
     delay in deciding plaintiff's July 2009 Rule 30 motion,
     the granting of which had potential for bringing forth
     testimony by Shelly Laveroni that was in conflict with
     O'Hara's September 2008 testimony, by acts and omissions
     of persons unknown [at HDC], who failed to provide notice
     of the 2012 Garth ruling, benefited defendants;

148. That the Town of Scituate Board of Selectmen, from August
     2005 onward, by its acts and omissions, wantonly and
     willingly condoned the initial as well as ongoing actions
     of its police department in prosecuting plaintiff in the
     manner that it had, that is, by its police and counsel,
     through at times clever and unethical means, never once
     providing plaintiff any opportunity, either in a court
     of law or lawful deposition, to confront his key accuser,
     Shelly Laveroni-Dell, and to undo a police deception;

149. That as result of the individual as well as collective
     acts and omissions of Defendant O'Hara and his cohorts,

37

149. (continued) for more than ten (10) years, plaintiff
suffered severe physical, financial and emotional
injuries including years of incarceration and continual
interruption of his professional pursuits;

150. That the Massachusetts Court of Appeals [COA], on July 8,
2010, set aside the September 18, 2008 trial verdict and
assigned a September 2010 rescript date;

151. That the Commonwealth reintroduced the disorderly conduct
charge on or about October 25, 2010;

152. That the Commonwealth did not retry the plaintiff within
one year of the MCOA's rescript date, as required under
speedy trial doctrine and Massachusetts law;

153. That on or about February 6, 2012 the plaintiff motioned
for dismissal of the disorderly conduct charge on the
basis, among others, that the Commonwealth did not retry
the plaintiff within one year of the MCOA's rescript date
and that, in any case, the Commonwealth knew, at all
relevant times, the whereabouts of the plaintiff;

154. That on June 16, 2015, the Hingham District Court
dismissed the disorderly conduct charge thereby ceasing
the prosecution of the charge - what can be deemed as

154. (continued) "favorable termination" as for plaintiff's perspective - after ten [10] years, one month and four [4] days;

155. That no current open criminal court matters exist with respect to the May 12, 2005 disorderly conduct charge;

156. That on April 13, 2016, after gathering case-related documents at the Hingham District Court [HDC], prompted by a Pfaff filing weeks earlier [Paragraph 184, Page 45], the plaintiff and his brother, Jonathan, as they left the courthouse, were followed in their vehicle [a jeep] by a Hingham police officer;

157. That, suspecting he was being followed, the plaintiff turned off the main road onto a residential street, was followed and then immediately pulled over by a certain Officer Orlandy, who was then joined by other patrolmen;

158. That Orlandy indicated that his department received a call about two persons in a "dark green jeep" [sic] driving without a valid license [plaintiff's vehicle, at the time, was a dark *blue* jeep but, coincidentally, in 2005, it was a dark *green* jeep, as only O'Hara knew];

159. That the plaintiff, who was driving, at the time, had a valid Ohio drivers license;

160. That the plaintiff immediately thereafter went to the Hingham Police Department where he was informed that a certain off-duty Scituate police officer, Mike O'Hara, had made the call;

161. That it was later determined, by an inquiry to Orlandy, that someone at the Hingham District Court [HDC], though not identified, had called O'Hara and told him of the presence of plaintiff and his brother at the courthouse;

162. That weeks later, on a public records request inquiry as to who called him [O'Hara], O'Hara's superior, Chief Michael Stewart, said he [O'Hara] could not recall;

163. That, it is believed, such person who called from HDC is the person unknown referred to throughout this complaint;

164. That, since it is known that such person, in April 2016, called O'Hara, we know that it is indeed O'Hara who is contacting or otherwise being contacted by the "hidden agent", to as late as April 13, 2016, nearly ten [10] months *after* dismissal of the disorderly conduct charge;

165. That the plaintiff, while at the town hall [April 12, 2016] sought public records, mainly, verifying Sandra Frankmann still resides at 52 Old Oaken Bucket Road;

166. That the plaintiff and his brother, on April 13, 2016, went to the Frankmann residence and spoke to her for about six [6] minutes, the first personal contact with her in nearly 11 years, despite numerous communications to her by plaintiff (emails and letters) that all went unanswered;

167. That the plaintiff asked Sandra if she had called Shelly Laveroni in the moments before the plaintiff went to her house [May 12, 2005] and Sandra said "no", she had not;

168. That when the plaintiff asked Sandra if she knew who did call Shelly she said that she "didn't know";

169. That Sandra Frankmann, on the evening of May 12, 2005, after the arrest of the plaintiff by O'Hara, had dinner with Susan Smith, her neighbor [Paragraph 22, Page 8];

170. That if Susan Smith had made the call to Shelly, just before the plaintiff rang her doorbell, then it is very likely that Sandra would have come to know such fact, so that Sandra's denial [Paragraph 168] is evidence of a

41

170. (continued) complicity by Sandra to deny the plaintiff
     any information about police misconduct;

171. That by neither the police nor witnesses identifying
     the caller, the plaintiff has not been able to, in either
     a court of law or personal inquiry, question the caller
     about what was said and further determining whether that
     which was said was true or not or that it bore on the
     conduct of the police, mainly, Defendant O'Hara, what
     could be deemed as a withholding of exculpatory evidence;

172. That on the prompting of Sherri Laveroni, mother to
     Shelly, who allegedly saw the plaintiff and his brother
     talking with Sandra on April 13, 2016, according to
     police documents [which appear to be falsely reporting
     matters; Sandra likely informed the Laveronis directly],
     the Scituate Police served multiple No Trespass Notices
     on the plaintiff and his brother that bars them entirely
     from 52 Old Oaken Bucket Road [A-G] and immediate area;

173. That these notices were signed by the Laveronis, Sandra
     Frankmann, Susan Smith and numerous "neighbors" [five
     total], all of whom the plaintiff and his brother have
     never met nor ever contacted, or attempted to, before but
     who nonetheless possess relevant exculpatory information;

174. That, it is reasonable to believe, contrary to police documents, as Sherri has never met the plaintiff, Sandra "alerted" Sherri as for plaintiff's inquiry to her, an act analogous to a cover up given the subsequent notices;

175. That the plaintiff had not, in nearly eleven [11] years, as of April 13, 2016, ever stepped upon the Laveroni property other than for approximately one minute for his May 12, 2005 inquiry [See Paragraphs 6-9, Pages 4-5];

176. That the eight [8] No Trespass Notices serve to deny plaintiff any direct ability to personally inquire into the facts behind the May 12, 2005 9-1-1 call, by Shelly, and subsequent arrest by the Scituate Police;

177. That singular and courteous phone calls, on May 14, 2005, to Susan Smith and Sandra Frankmann, led [wrongly] to an Harassment charge being levied against the plaintiff, a charge that took 3 ½ years to be dismissed [See Page 12, Paragraphs 38-41], thus precluding phone contact as well;

178. That said notices, it appears, were solicited by the Scituate Police as a means to cover up prior misconduct by inhibiting plaintiff in his fact and truth finding, mainly, as for the acts and omissions of Defendant O'Hara;

43

179. That the Town of Scituate's Board of Selectmen [BOS], from March 2016 to June 2016, scheduled and conducted numerous Executive Sessions with the cooperation of Chief Stewart and the plaintiff as primary subject;

180. That the BOS to-date has not made public any official records or minutes of these sessions;

181. That, as such, the BOS, it appears, is continuing to empower the Scituate Police, primarily Chief Stewart and Officer O'Hara, to proceed with nefarious and improper actions against the plaintiff, with no public oversight, to include surveilling and harassing him with respect to lawful fact finding, doing so long after cessation of criminal proceedings yet at a time when civil proceedings had yet to cease, demonstrating a self-awareness, by the BOS, of civil liability;

182. That, it appears, the BOS, despite its charter, is not letting the public nor the plaintiff know or have an ability to know what the board is doing with respect to the plaintiff and his litigation with the police and town;

183. That, it appears, as two of the subject executive sessions occurred *before* certain actions were taken by the Scituate Police against plaintiff, the BOS had

183. (continued) condoned the issuance of numerous No Trespass
     Notices spoken to above as well as other conduct by Chief
     Stewart and O'Hara, as noted earlier in this complaint;

184. That, in March 2016, well before the April 2016 visit
     to HDC by plaintiff, the BOS, through its administrator,
     Patricia Vinchesi and others situated with her, hired
     Attorney Pfaff to file an injunction motion with respect
     to plaintiff and his past and future-intended litigation,
     the very injunction that prompted this second amendment;

185. That, in April 2016, after getting documents at the HDC
     in support of an opposition to said injunction request,
     the plaintiff opposed on grounds, among others, that, for
     one, there was, with respect to the underlying state
     prosecution at root of earlier lawsuits, "favorable
     termination" and thus a greatly diminished basis, for
     Pfaff, to seek an injunction as the fourth and final
     element of a malicious prosecution claim was therefore
     met in addition to the ripening of federal claims as per
     a First Circuit ruling in a prior related case, No. 13-
     11598-FDS, out of which, ironically, came the injunction;

186. That Pfaff, in his motion, failed to cite the "favorable
     termination" [dismissal of the disorderly conduct charge].

## Damages

1.  That as a result of the long, ongoing and baseless
    prosecution of the plaintiff on a disorderly conduct
    charge, at over ten years running, the plaintiff has had
    to endure multiple and extensive physical, financial and
    emotional costs and expenses, pain and suffering, anxiety,
    apprehension, humiliation, embarrassment in newspapers,
    court records, online and in social, professional and
    academic circles, inconvenience, frustration, extensive
    and undue travel, the inability to renew his drivers
    license for many months on two (2) distinct occasions as
    the result of warrants outstanding, loss of respect and
    reverence of his friends, family, colleagues and peers,
    lost income, loss of consortium and numerous and various
    opportunities lost or impaired and other damages not as
    yet known, identified, accrued or specified.

2.  That as a result of the prosecution of the plaintiff on
    a disorderly conduct charge, which saw numerous periods
    of extended incarceration and required his appearance at
    pretrial hearings as well as a trial, the plaintiff had
    to endure delays and interruptions in the pursuit of his
    graduate studies, work credentials, and other projects
    and goals, causing, among others, heavy financial loss;

46

3.  That as a result of the long, ongoing, baseless sand
    seemingly endless prosecution of the plaintiff on a
    disorderly conduct charge, which brought about extended
    periods of *federal* as well as state incarceration, the
    plaintiff's follicular thyroid cancer treatment saw
    significant delays and omissions that could as yet bring
    about indeterminable future pain, suffering, and anxiety,
    especially as for the spinal degeneration verified last
    summer [by MRI], a condition that now prevents plaintiff
    from sleeping horizontally in a bed [requiring instead
    that he sleep on a recliner];

### Facts Relied Upon

Allegations herein are supported by facts and evidence
contained in public court records, police reports, the sworn
testimonies of Jeffrey L. Clemens and Jonathan A. Clemens,
that which is obtainable under Discovery including sworn
depositions, expert testimonies, 9-1-1 audiotapes and police
radio logs, police phone logs, the testimony and reports of
past and present employees of the U.S. Secret Service, the
Federal Bureau of Investigation {FBI}, the Scituate Police
Department, Hingham Police Department, the Town of Scituate
Board of Selectmen, including official minutes and other
written documents, and others yet to be cited or yet unknown,

including but not limited to those associated with the Hingham District Court, the Hingham Probation Office and Massachusetts Parole Board and Attorney General's Office.

### Cause of Action

The preceding facts, provable allegations and reasonable inferences made from them constitute actionable conduct on the part of the named defendant, Michael O'Hara, to be otherwise designated as Count [1], more specifically:

1. The acts and omissions on the part of Defendant Michael O'Hara constitute malicious prosecution.

### Relief Sought

The plaintiff prays for equitable relief in the form of damages, in the amount of $600,000 compensatory, to be proven at trial, and $1,800,000 punitive, and other relief as deemed fair and appropriate.

### Jury Trial

The plaintiff hereby demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.


Respectfully submitted,

Jeffrey L. Clemens      Dated this 10th day of November 2020